ABILENE GAS & ELECTRIC CO. v. THOMAS. (No. 8712.)

(Court of Civil Appeals of Texas. Ft. Worth. Oct. 13, 1917. Rehearing Denied Nov. 10, 1917.)

1. ELECTRICITY ⬦16(3)—FAULTY INSTALLATION—LIABILITY.

Maintaining electric light and power plant transmitting 33,000 volts over wire constructed over public road, without ammeter, circuit breaker, or ground detector, is negligence little, if any, less than criminal, and the operators must be held to have anticipated severe shock or death from breaking of wire without shutting off the current.

2. ELECTRICITY ⬦19(8) — GROUND WIRES — INJURIES TO PERSONS—QUESTIONS FOR JURY.

Evidence *held* to present question for jury. in action for injuries when high-voltage light and power wire over highway broke, and plaintiff received shock.

Error from District Court, Taylor County; Thomas L. Blanton, Judge.

Action by Mrs. Mattie Thomas against the Abilene Gas & Electric Company. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 194 S. W. 1016.

Cunningham & Oliver and J. M. Wagstaff, all of Abilene, for plaintiff in error. Preston Martin, of Weatherford, for defendant in error.

CONNER, C. J. This writ of error has been prosecuted from a judgment in favor of Mrs. Mattie Thomas in the sum of $1,000 as damages resulting from an electric shock by a broken or grounded wire on plaintiff in error's electric line extending from the city of Abilene some 18 miles westward along a public road to the town of Merkel. The assignments of error only call for a determination on our part of the sufficiency of the evidence to sustain the verdict and judgment in defendant in error's favor.

The evidence shows that the plaintiff in error had constructed and begun to operate a high-tension electric wire from Abilene to Merkel on September 3, 1915. The line carried from 33,000 to 35,000 volts of electricity. The wires were suspended upon poles 150 feet apart. Witnesses who testified in behalf of plaintiff in error indicated a proper installation and construction of the line with suitable material, with exception to be hereinafter noted. · On the night of the day mentioned, to wit, September 3d, the line was tested and the current turned on, and no defect in the line was apparent between Merkel and Abilene. On that night, however, Mrs. Mattie Thomas, together with her husband and a son and daughter, camped at Elm creek about 4 miles west of Abilene on their way to Merkel. During the night, about 4 o'clock a. m., the husband and wife were awakened by a "popping," "sizzling" noise, which, on the following morning, was found to proceed from a broken wire of the electric line. The family had camped near the side of the road convenient to watering places in Elm creek, and the broken line was near the camping place. The agitation of the line had ceased when discovered in the morning, but soon afterwards a milch cow accompanying the Thomases crossed over the line of the broken wire and was shocked so that she fell to the ground, and Mr. Thomas called for an axe with which he chopped the wire in two, and thus released the cow. Later in the morning after the preparation and consumption of the morning meal the son and daughter each rode a horse to and from the watering place along some paths which extended on either side of one of the poles from which the broken wire depended. The little son passed upon one side and the daughter upon the other. The wire at this time was hanging down towards the ground without agitation or noise, and neither the son nor daughter nor the horses ridden by them were injured. A few minutes thereafter Mr. Thomas, who had gone to the watering place to drive one of the work horses up, also came along one of the same paths. The boy and his mother, according to their testimony, were looking at him at the time. Mr. Thomas had a stick in his hand. As the horse came opposite the post from which the wire extended it was seen to strike the horse on the shoulder, producing a flash of fire, and resulting in the immediate fall and death of the horse. Mr. Thomas, by the testimony referred to, was seen to strike at the wire, either in an effort to knock the wire from his horse, or to ward it away from his own person. However this was, the wire flew from the horse and struck Mr. Thomas, who likewise instantly fell dead to the ground. Mrs. Thomas immediately ran to her husband to drag his body from out of danger. She testified that at this time the wire was hanging down the pole, but not in contact therewith, with the broken end some 2 feet from the ground and some 18 inches from her deceased husband's body. The other evidence showed that the ground was dry at the time, and expert testimony offered in behalf of the plaintiff in error was to the effect that the arcking or flowing distance of electricity from such a broken wire would not extend beyond 3 inches from the broken end. Mrs. Thomas testified, however, that as she caught her husband she was shocked; that she became dizzy, and was later affected with serious headache and other ailments of the body specifically described in the testimony. She nevertheless succeeded in drawing her husband out of the line of the current, and soon thereafter accompanied the body to Abilene, testifying that she never let loose the body of her husband until after they took her away on their arrival at the undertaking establishment in Abilene, and at which time and place she was waited upon and attended by a physician paid by the plaintiff in error.

It is insisted that the court erred in refusing to give a peremptory instruction as requested by the plaintiff in error. It is contended that the instruction should have been given for the reasons: First, that the evidence fails to show that Mrs. Thomas received an electric shock at all; second, that if she did, it was due to her own contributory negligence; and, finally, that no negligence on the part of the plaintiff in error was shown. We have had no difficulty in disposing of the last two questions. The testimony of Mrs. Thomas tended to show that she was without previous experience or association with electric wires or currents of the kind under consideration. Shortly previous she had observed her husband release their cow from danger and noted the cow's recovery, and she testified that, as was very natural, she hurried to the relief of her husband without thought of danger to herself. In all of the evidence relating to this phase of the case we fail to find what can be reasonably denominated a trace of negligence on the part of Mrs. Thomas.

On the issue of plaintiff in error's negligence we think the evidence is likewise plainly in favor of the defendant in error. Assuming it to be true that plaintiff in error exercised due care in the selection and erection of its poles, and in the extension of its wires, and in the inspection of the same after they had been extended, and after the current had been turned over them, it is nevertheless undisputed that one of its wires carrying a very powerful current of electricity broke; that the current was maintained in the broken wire until some time after all of the occurrences heretofore mentioned. It further appears that at the time of plaintiff in error's application before the commissioners' court of Taylor county, within which Abilene and Merkel are situated, a discussion was had about the danger of the wire's coming down on the public road, and assurance was then and there given that "the plant was so constructed that the current will immediately pass out of the wires and be of no danger of their falling on the ground."

Veal Carroll, a witness in behalf of defendant in error, who we think the evidence shows was properly qualified to speak as an expert electrician, among other things, testified:

"If electrical appliances are properly installed at the plant or power house where the electricity is generated, with my experience and knowledge of electricity and the way and manner same can be handled and controlled with electrical appliances, I could tell at the plant or power house if there was a broken and grounded wire on the line over which the current was being transmitted. As to what is ordinarily used by electricians to detect trouble such as a broken wire on the line or a crossed circuit, under all conditions, an ammeter or a circuit breaker properly installed at the plant would detect the trouble, and if the wire is grounded, there should be a ground detector, and I would say that ordinarily there is used an ammeter, the circuit breaker, and the ground-detector."

He further testified that if these instruments "are properly installed they will make known the trouble at once at the plant where they are." He testified further:

"An automatic circuit breaker is an instrument used for opening an electric circuit; and if the wire should break and fall to the ground, it instantly opens the circuit and cuts off the current between the generator and the trouble. There could not be any danger resulting from a broken wire which is heavily charged with electricity if there is properly installed an automatic circuit breaker and it works properly. The current that is on the wire immediately goes off and leaves the wire, if there is in use on said wire an automatic circuit breaker properly equipped and installed, the moment the wire is broken."

[1] The expert electricians placed upon the stand as witnesses by the plaintiff in error also testified in relation to the use and function of "circuit breakers" and "ground detectors" substantially as did the witness Carroll, and it is undisputed in the evidence that at the time of the occurrence under consideration plaintiff in error had not installed in its generating plant at Abilene, or elsewhere along its line, either a circuit breaker or a ground detector. To so maintain a plant of the kind without these instruments, and generate and transmit over a wire extending along a public road a 33,000 voltage of electricity, or any other voltage or current capable of producing instant death, constitutes in our opinion negligence of a character little less, if any, than criminal. Other evidence shows that, ground detectors and circuit breakers are, and have been for many years, in constant use in the electrical plants of the country, and those charged with the responsibility of operating plaintiff in error's plant must be held to have anticipated results such as shown in this case.

We have had greater difficulty in determining the contention that the evidence fails to show that Mrs. Thomas was in fact shocked by the electric current, as is contended. After a very careful consideration of the evidence, however, we do not feel able to disturb the verdict of the jury in her favor on this issue. It is true that the experts who testified in behalf of plaintiff in error testified without contradiction that the charge of electricity which killed Mr. Thomas would immediately pass from his body into the earth, and that Mrs. Thomas, therefore, could not have received the shock of which she testified through the person of her husband. It is true also that, as before stated, they testified that the arc or flying distance of a current of electricity from the end of a broken wire would not extend beyond 3 inches from the broken end, and they, therefore, gave it as their opinion that if the wire was as far distant from Mrs. Thomas and the body of her husband at the time she took hold of it as 18 inches, she could not thus have received the shock. Nor could she, they thought, have received the shock through the ground; it having been shown that the ground and the body of the husband were dry at the time. It is also true that the subsequent blindness, nervousness, weakness, and other ailments that Mrs. Thomas testified followed the shock might for a time follow a nervous shock from seeing her husband suddenly stricken to the earth. The evidence indicates that her grief was great, but there is evidence plainly tending to show that before the occurrences under consideration Mrs. Thomas was a healthy woman, fully able to do all of her work, and unaffected by any of the diseases which later developed. The testimony of several of the physicians who treated her subsequently plainly tended to establish the fact that she was affected with the troubles she detailed, and a number of the physicians testified that permanent injuries of such character would not probably follow a nervous shock caused by grief over the sudden death of her husband. The testimony of the physicians further tended to show that the ailments of which Mrs. Thomas testified were serious

and permanent in their character, and such as could have been produced by an electric shock of considerable force. The defendant in error's son testified at one place that the wind was blowing, and it is undeniable from the evidence that the wire was quiescent, and not moving at the time the little boy and girl passed the post, but did move and fly against the horse and Mr. Thomas a moment or so afterwards; thus indicating that either by reason of the wind or by some excessive impulse of electricity the wire was caused to suddenly move, and the jury may have concluded, as we think might reasonably be done, that subsequent to the time when Mrs. Thomas observed that the depending wire was not moving and at the very instant when she took hold of her husband that the wire by reason of the action of the wind or from some impulse caused by an increase of the current, or otherwise, suddenly moved in such close proximity to the person of Mrs. Thomas as to give her 'the shock to which she testified. It is not impossible, as it seems to us, to conceive that this might have happened without inflicting a burn on the person of Mrs. Thomas and without having been of sufficient force to instantly render her unconscious or disable her from the performance of the things she did thereafter. It is certainly true that Mrs. Thomas testified explicitly that she received the shock. And among other things she said: "In my past life I have felt the current of electricity which there is in an ordinary battery. I know what it means. I know what the sensation is. I felt a sensation of that kind at the time. * * * The shock that I felt there at the time I took hold of my husband was a much stronger shock than from the telephone battery. I could not tell you how much stronger it was, because I do not know."

[2] On the whole we think it was for the jury to reconcile or adjust the conflicting tendencies of the evidence, and to give credence and weight to such of the testimony as they felt impelled to do by a sense of their duty, and their verdict having been in favor of the defendant in error, and having been approved by the trial judge, we decline to disturb either the verdict or judgment.

The judgment will, accordingly, be affirmed.