## TEXAS UTILITIES CO. v. DEAR.

No. 4063.

Court of Civil Appeals of Texas. Amarillo.

Oct. 4, 1933.

Rehearing Denied Nov. 8, 1933.

808

Underwood, Johnson, Dooley & Huff, of
Amarillo, for appellant.

Williams & Day, of Plainview, and Wm. F. Nix, of Amarillo, for appellee.

HALL, Chief Justice.

The appellee, a feme sole, recovered a judgment against appellant in the sum of $5,000, on account of personal injuries which she alleges she received because of the negligence of the appellant company.

The substance of her petition is: That on the 24th day of May, 1931, she lived on an eighty-acre farm about three and one-half miles northwest of Olton, in Lamb county, where she had lived practically all of her life. That the Texas Utilities Company was a public service corporation, maintaining high-tension power transmission lines which ran along the eastern boundary of the section upon which she lived and approximately a mile from her residence. That said power lines carried a current of approximately 23,000 volts at all times. That said power lines were constructed long after appellee had established her residence on said farm, and that she did not know of their existence. That she is a widow, thirty-three years of age, maintains herself by the management of her farm, leasing the land, caring for her milk cows, hogs, chickens, gardens, etc., and selling the products, upon which she depends for a living. That she was ignorant of the use, nature, danger, and hazards incident to the handling and controlling of electric currents and wires charged therewith. That the fences of said section of land were connected, reaching from the fence under said power line and across the section a mile to plaintiff's house and around her yard, garden, barnyard, barn, and other outbuildings. That the said fence was constructed of ordinary barbed wire common to the country, save and except the fences around her barn and yard, which were constructed partly of boards and partly of woven wire. That on said day, shortly after nightfall, she saw through her window a vast field of light and fire which illuminated the countryside along the fence row and vegetation, such as bear grass (yucca), being green, which grew along and against the fences. That said vegetation caught the glow, and appeared to be burning and sparkling in a very unusual manner. Large balls of fire rolled from the fences down the bear grass plants and along the stalks thereof to the earth and, sparkling, sank into the earth. That all of this unusual appearance, strange and frightful, caused her terror and fright, resulting in great nervous shock. That upon further investigation she found the fences around her barn catching fire and the grass along her garden fences near her house in flames, threatening the destruction of her property. That she did not know the nature or the cause of the phenomena nor what element was causing the fires. That she undertook to throw water upon the flames, but was three times knocked down by the electric current when she dashed the water upon the fire. That this condition lasted from thirty minutes to an hour, and, as a result of plaintiff being struck and knocked down by the electric current, she sustained terrible injuries and was seriously hurt. That she touched a wire on her gate and was again knocked down, but did not understand what the force was that was hurting and injuring her. That she sustained as a result of this violence physical injuries which incapacitated her from the time of the occurrence and will continue to disable her through her life. That she was not able to work, etc. She alleges that the cause of her injuries was the negligence of the appellant in failing to ground the wires of the fence under its power line and permitting a wire of said power line to break, fall, and remain upon the fences connected with her property and its failure to maintain a circuit breaker in its generating plant that would automatically cut off and control the current upon the line becoming broken, as it did.

The appellant answered by general demurrer and various special exceptions, pleas of contributory negligence, asserting that appellee was negligent in not remaining in her house while the fires were burning; that she was further guilty of contributory negligence in throwing more than one bucket of water on the fire after she had been knocked down the first time; that she knew, or should have known, that, if it knocked her down once, it might do so again, and that she should have understood that something was wrong and should not have thrown water on the fire more than once.

The case was submitted on special issues, in response to which the jury found that the fences on and about the premises of Mrs. Dear became charged with dangerous voltage of electricity on May 24, 1931; that such electricity came from the defendant's broken power line; that she suffered physical injuries as the result of her fences being charged with such electricity; that the breaking of the power line on the occasion in question did not result from any negligence of the defendant; that the failure of the defendant to have its circuit breaker adjusted so that it would open when the line broke and fell was negligence; that such negligence was a proximate cause of the injuries sustained by plaintiff; that the defendant failed to sufficiently ground the fences under and near the place where its power line broke on said date; that such failure constituted negligence and was a proximate cause of the injuries complained of; that the breaking of the power line at said time was not caused by lightning; that the act of plaintiff in throwing the first bucket of water where she did throw it was not negligence; that she was not guilty of negligence in throwing the

third bucket of water where she threw it. The jury assessed her damages at $5,000, and judgment was entered accordingly.

By the first two propositions the appellant insists that the court should have directed a verdict in its favor. We overrule this contention for reasons which will appear from our discussion of other propositions.

The court properly defined negligence and ordinary care.

Special issue No. 3(a) is as follows: "Do you find and believe from the preponderance of the evidence that the failure of defendant to have its circuit-breaker adjusted so that said circuit-breaker would open when the high-line in question broke and fell, was negligence upon the part of the defendant?"

Special issue No. 4(a) is: "Do you find and believe from the preponderance of the evidence that the defendant failed to sufficiently ground the fences under and near the place where the defendant's line broke on May 24, 1931?"

■■ By its third proposition the appellant attacks these issues, insisting that they imposed upon appellant the absolute duty of having its circuit breaker properly adjusted and the fences sufficiently grounded. The general rule is that a charge must be considered as a whole, and the court had previously defined negligence and ordinary care, and we must assume that the jury, in answering the two issues, took into consideration the court's definition of negligence previously given.

■ Appellant further insists that the case was not submitted "on the true legal theory," and, since plaintiff did not suggest any such submission, the right to recover upon the grounds alleged has been waived under the doctrine announced in Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084. We cannot assent to this contention.

R. S. art. 2185, provides that, when a charge is in any respect objectionable, it is the duty of the complaining party to file his objections in writing, and "all objections not so made are waived." It is further provided by article 2190, as amended by Acts 1931, c. 78, § 1 (Vernon's Ann. Civ. St. art. 2190), that, where an issue is not submitted, the failure of the court to submit an issue "shall not be deemed a ground for reversal of the judgment, unless its submission has been requested in writing by the party complaining." The record fails to show that the appellant objected to either of the issues upon the grounds urged in its third proposition and failed to tender an issue during the trial correcting the alleged error and failed to raise the question of the sufficiency of said issues, even in its motion for new trial. It is uniformly held in construing the above statutes that such questions cannot be raised for the first time on appeal. The ground of plaintiff's recovery is negligence in the particulars specified. Plaintiff was not required to plead that the defendant failed to use ordinary care or had failed to use such care as an ordinarily prudent person would use under the same or similar circumstances. A general charge of negligence was sufficient. The duty then rested upon the court to instruct the jury as to the degree of care. As stated above, this was done in the first part of the charge and no objection was made to the court's definition of negligence and ordinary care. Under this state of the record, it cannot be insisted that the plaintiff has waived her right to recover by not requesting an issue which inquired of the jury whether the defendant used ordinary care. If defendant desired the submission of such an issue, it was its duty to make the request.

But the appellant did object to special issue No. 3(a), insisting that it is on the weight of the evidence; assumes that the defendant's circuit breaker could be adjusted and should have been adjusted so that it would open when the transmission line broke and fell; assumes that the circuit breaker was a device designed and constructed to act when there was a break in the wire, as in this case; assumes that the circuit breaker would operate at the plant when the wire broke without reference to any special conditions which may have related to the particular break; and suggests that it was negligence on the part of the appellant not to have its circuit breaker so adjusted with respect to this particular wire.

The further objection is urged to the issue in that it ignores the fact that there is no evidence showing whatever adjustment or setting may have been made of the circuit breaker which would have caused it to operate and open when the line broke, and assumes that it was the purpose of the contrivance that it would operate and open as a result of the broken line, notwithstanding the evidence herein is to the effect that the purpose of such instrument is not the protection of the public, but for the protection of the defendant's plant and electrical system, and further because there was no testimony showing any duty on the part of the defendant to install a circuit breaker and a complete absence of testimony that it could under any circumstances constitute a safety device for cutting off the current upon the breaking of the line.

Objection was also made to special issue No. 4 and its subdivisions (a), (b), and (c), because it places too great a burden upon the defendant in assuming that it was defendant's unqualified duty to have sufficient ground connections upon the fences along and near the place where the transmission wire broke, and assumes that it was the duty of the defendant to have the fences near the

place where the wire broke sufficiently grounded to completely divert the current from the fence into the ground, thereby imposing a higher measure of care than the law warrants.

The further objection was interposed that there was no testimony tending to show that the fence wires could have been grounded any more effectively than they were or to show that, if the means of grounding the wires had penetrated into the ground the full depth of fifteen or twenty feet as claimed by plaintiff's witnesses, it would have served any better to avoid surcharging the fences.

■ The general rule is that an electric company is liable for injuries caused by defects in its plant or system. Wehner v. Lagerfelt, 27 Tex. Civ. App. 520, 66 S. W. 221; International Light & Power Co. v. Maxwell, 27 Tex. Civ. App. 294, 65 S. W. 78.

"Electricity is a silent, deadly, and instantaneous force; and one who uses it for profit is bound to exercise care corresponding to the dangers incident to its use." San Antonio Gas & Electric Co. v. Ocon, 105 Tex. 139, 146 S. W. 162, 164, 39 L. R. A. (N. S.) 1046.

■ Or, as expressed in Texas Public Service Co. v. Armstrong (Tex. Civ. App.) 37 S.W.(2d) 294, 295: "The standard of care required is not that of the uninformed public as to the dangers of electricity; but that of those who are familiar with and undertake to distribute this dangerous and mysterious force. The prudence required of those distributing dangerous articles to the public must be proportionate to and commensurate with the dangers involved." See, also, Jacksonville Ice & Electric Co. v. Moses, 63 Tex. Civ. App. 496, 134 S. W. 379; Rucker v. Sherman Oil, etc., Co., 29 Tex. Civ. App. 418, 68 S. W. 818.

In Abilene Gas & Elec. Co. v. Thomas (Tex. Civ. App.) 198 S. W. 1027, 1029, Judge Conner, in discussing the duty and liability of an electric company which had not installed proper devices for protecting third parties who might come in contact with its broken wires, stated: "To so maintain a plant of the kind without these instruments, and generate and transmit over a wire extending along a public road a 33,000 voltage of electricity, or any other voltage or current capable of producing instant death, constitutes in our opinion negligence of a character little less, if any, than criminal. Other evidence shows that ground detectors and circuit breakers are, and have been for many years, in constant use in the electrical plants of the country, and those charged with the responsibility of operating plaintiff in error's plant must be held to have anticipated results such as shown in this case."

■■ It is true that the jury found that the breaking of the line did not result from any negligence of the defendant, and presumably this finding is based upon the fact that the plaintiff could not and did not introduce any evidence which tended to explain why the line broke. The jury further found that the break was not caused by lightning, and that plaintiff was not guilty of contributory negligence. There can be no contributory negligence where there is no knowledge of danger. Texas-Louisiana Power Co. v. Webster (Tex. Civ. App.) 59 S.W.(2d) 902. We are of the opinion that under all the facts the breaking of the line comes within the doctrine of res ipsa loquitur.

"Where the thing which caused the injury complained of is shown to be under the management of defendant or his servants and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of care. This statement of the rule of res ipsa loquitur, based on the expression in an early English case (Scott v. London, etc., Docks Co., 3 H. & C. 596) which has been widely quoted with approval, has been, in substance, most frequently adopted and applied in subsequent decisions so that the ground of an injury under the circumstances therein set forth raises a presumption or permits an inference that the party charged was guilty of negligence." 45 C. J. 1193, § 768.

"While the general rule as to the burden of proving negligence applies, as already stated, to actions against electric companies for personal injuries, yet such actions also frequently afford an apportunity for the application of the well established doctrine that where the thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of events would not happen if he had used proper care, it affords reasonable evidence, in the absence of a satisfactory explanation, that the accident arose from a want of care. The mere introduction of the facts surrounding an injury from electricity, showing that such injury resulted from contact with live electric wires or other appliances when out of proper condition or out of their proper place, may suffice, under this doctrine of res ipsa loquitur, to raise a prima facie presumption that the electrical company having such appliances in charge has been negligent in the performance of its duty, and to place upon the company the burden of overthrowing such presumption. The exceedingly dangerous character of live electric wires lends force to the strict application of this rule of law to accidents occurring through contact with them under such circumstances, and, unless the rule of res ipsa loquitur is applied, it is evident in a

large number of cases liability for the resulting injury will be escaped. It is within the power of these companies at all times to show whether they have exercised due care in the erection, and subsequent supervision and maintenance of their wires and appliances, while to prove an actionable lack in these things would be, in many cases, practically beyond the reach of the person injured." 9 R. C. L. 1221, § 30. See, also, 20 R. C. L. 185 to 188.

The allegations in paragraph 8 of the petition to the effect that the line broke as the proximate result of the negligence of the defendant is a general allegation of negligence, good as against a general demurrer, and it has not been abandoned by the further specific allegations of negligence with reference to the circuit breaker and the failure of the defendant to sufficiently ground the fence, because it is clear that these last two grounds of negligence were not intended to be covered by the general allegation, else the court would not have submitted all three grounds to the jury in which the defendant has acquiesced by not claiming abandonment. 45 C. J. 1084, § 653; Texas & Pacific R. Co. v. Thompson (Tex. Civ. App.) 286 S. W. 536; Trinity & Brazos Valley R. R. Co. v. Geary (Tex. Civ. App.) 169 S. W. 201.

It is held in Humphrey v. Twin State Gas & Elec. Co., 100 Vt. 414, 139 A. 440, 56 A. L. R. 1011, that, where a party is injured from a sagging or fallen wire, proof of the escape of the current and the injury therefrom makes a prima facie case, citing numerous authorities.

Price, the electrician, and Anstead and Sanders, two of the defendant's linemen, testified at some length with reference to the circuit breaker and the efforts of the company to ground the wire fence over which the line was constructed. Price said the company had a circuit breaker at Tuco, the central station, for each of its transmission lines; that the line in question carried 23,000 volts, and that, if a line broke a long distance from the plant, "if the flow of the current was other than a heavy flow the circuit-breaker would open; if the flow did not result in a heavy flow of current, nothing would happen"; that the maximum current over the line in question would be 25 to 30 amperes; that the circuit breaker of this particular line was set at 80 amperes; that the circuit breaker would not operate if one of the lines broke north of Olton two or three miles and came in contact with a wire fence which inclosed a section; that he would not expect it to operate unless the fence was pretty well grounded, and that it might not operate even then; that, if the flow of the current reached 80 amperes or more, and the circuit breaker did not open, it would evidence the fact that there was something wrong with the breaker or relay which was shown to

be a part of the mechanism of the breaker. He further testified that the records of the office did not show that the breaker opened at the time of the occurrence involved in this suit.

After considerable questioning, Price was asked: "I believe the final result of your testimony about the current is even though a line broke and fell on a fence, it would not increase the current much unless there was somewhere connected with that break or fence, a good ground, and unless the current was increased to 80 amperes it would not throw the switch. That where the line was fifty or sixty miles long, the resistance would be such that even though there was a good ground when a line broke and fell on the fence, the automatic circuit breaker would not operate, even though there was a good ground?" His answer was "Yes." This witness explained that the most usual thing which disturbed a high-line system was lightning; that it raises the voltage in the line above that in the ground, and that, if this voltage rises to too great a flow, the insulators cannot stop it, because the current will flow around the insulators and down the pole, if it happens to be wet, or it might flash from the pole on to the ground; that it would not be practicable to operate the line at 50 amperes, because at times the company had to pass more than 50 amperes through the circuit, and it was set at 80 because they frequently had occasion to have some line doing double service or duty; that in case of a breakdown at the Amarillo plant, throwing the whole load of the Amarillo system on to the Olton line, it would probably exceed 80 amperes.

This question was asked him: "Then are we right in assuming that at that time [the time of the occurrence in question] the Texas Utilities Company had in use no instrument or means which would automatically protect people coming in contact with the fence upon which a broken line had fallen? A. I can't say as to whether they had any means or not. There was no instrument at the plant that would give us a definite indication.

"Q. Or that would cut the flow of electricity off? A. There were none that would do that either.

"Q. I believe you stated that the oil circuit-breaker would open, that it was installed to protect the circuit if the circuit became grounded as in a line coming in contact with another line? A. It would not be a ground. It would be a short circuit.

"Q. I did not say a ground, that is what it is installed for, that is to protect the Company's own property and keep its own system in operation and not for any other purpose, it is? A. Primarily to protect the service to our customers.

"Q. To protect the service of your customers? A. Yes, sir.

"Q. By service you mean the continued delivery of electric current through light meters and such as that? A. Yes, sir.

"Q. And not to protect other people who might come in contact with the fence that had become charged with the current from your line? A. The oil circuit-breaker is not to protect the public in such a contingency."

This witness had previously testified that the oil circuit breaker was the only appliance or device of any kind which its company had to break the flow of electricity in case of an accident.

With reference to the sufficiency of the company's efforts to ground the wire fences, this witness was asked: "Were those grounds, supposing that they were grounds of a certain kind and the high-line fell on the fence and charged the fence with electricity so that it showed bright and appeared to be lit up and down the posts and burn the wires in two, what would you say as to the effectiveness of those grounds? A. I would say they were not effective."

At another point in his examination he testified that the oil circuit breaker was set at 80 amperes because the company sometimes had to double its load on particular circuits.

The witness Bott testified as an expert that 45 amperes or possibly 50 would have been a proper setting for the circuit breaker where the line carried a load of 25 with a maximum of 30 amperes. This testimony was not contradicted.

The substance of Price's testimony is that, instead of setting its circuit breaker at 45 to 50 amperes, which would have cut off the current when the line broke and fell, it maintained the setting at 80 amperes, for the reason that it frequently had to place a double load of current on that line. This, when considered with the further testimony of Price to the effect that it did not set its circuit breaker in order to regulate the voltage of current flowing through its lines with a view of protecting the public, is sufficient to show negligence under the rule announced by Judge Conner in the Abilene Gas & Elec. Co. Case, supra. The evidence shows that this line crossed the public road which ran along the section upon which the plaintiff's farm was situated. Appellant's witness Sanders also testified that, according to his experience and observation, nothing would cause the circuit breaker in question, when set at 80 amperes, to disconnect and break the circuit except a short circuit between two of its wires, and appellant asserts in its brief that it is undisputed that one broken high-line wire, as in the present case, would not make a short circuit. The finding of the jury that lightning did not break the wire (which finding is supported by the testimony)

and further evidence shown by the records at the central office that there was no break in the circuit on this line, as indicated by the circuit breaker, when unexplained, shows that the company was negligent in setting its circuit breaker at 80 amperes. It was not shown that the company had a ground detector or any other device or appliance which would operate to break the circuit under conditions shown to exist in this case.

Appellant's witness Anstead, a lineman, testified that a "dead man" was a rock, a block of wood or cement which farmers buried near their fences at various depths from two to four feet; that barbed wire extended from the "dead man" to the top of the post for the purpose of supporting the post and keeping the fence wires from pulling it out of line. He assisted in constructing the line, and testified that, in order to ground the wires of the fences, the company's employees would tie a copper wire on to the fence wires and then attach it to the guy wire which extended from the top of the post to the "dead man" buried below the surface. He admitted that these guy wires were generally rusty, but testified that south and north of the place where the transmission wire broke the company had three or four poles tied to galvanized rods which were not ground rods but just as good; that said rods extended five or six feet into the ground, and were intended to support the poles in case of storms. According to his testimony, a ground wire should extend from the barbed wire of the fence deep enough into the earth to reach moisture, and that it was not a hundred per cent. ground unless the "dead man" or the ground rod reached that depth. He testified that all of the farm houses in that vicinity had wells and windmills, and that there was permanent water under the soil of that district; that, if the company had gone deep enough in an effort to ground the fences, it would have found water; that climatic conditions, the distance to permanent water, varied the standard for grounding fence wires in different communities; that, if a barbed wire fence is grounded with a hundred per cent. ground and a transmission wire should break and fall on it, a big lot of current would go into the ground from that part of the high line which rested upon the fence; that, if there was a hundred per cent. grounding of the fence, there would not be any large balls of electric fire or any great electrical display on the fences in that vicinity.

The records at the office in the central office at Tuco showed that from 3 o'clock p. m. to 11 o'clock p. m., there were breaks in the circuit on the Clovis-Slaton line and the Petersburg line, but none on the Olton line in question, until after midnight.

The effect of this testimony, without question establishes negligence, and brings the case within the res ipsa rule. 45 C. J. 1082, 1193; Texas-Louisiana Power Co. v. Daniels

(Tex. Civ. App.) 61 S.W.(2d) 179, 181; Texas-Louisiana Power Co. v. R. B. Webster et al. (Tex. Civ. App.) 59 S.W.(2d) 902.

Moreover, it establishes the allegation that the circuit breaker was not so adjusted that it would protect third persons living along the line in case of a break, and Price testified that the company did not install it for the purpose of protecting the public or those who should come in contact with fences which had been charged by its broken wires. Their sole purpose in installing it, according to this witness, was to insure a flow of current to its customers and to protect the machinery at the central plant. This convicts the company not only of negligence, but, in our opinion, it amounts to negligence per se. A circuit breaker which will not break the circuit is not entitled to that name. Under the conditions shown by the uncontradicted testimony of its own witness, the company in this case stands before the court in the same condition as did the Abilene Gas & Elec. Co. v. Thomas, supra, decided by Judge Conner. It has fallen far below the measure of its duty to the people, and, in the distribution of its deadly current of electricity, the care used to protect the public is not in proportion to, nor commensurate with, the dangers involved. So, if it be admitted that the trial court assumed there was negligence in submitting the two issues last above set out, he was justified in doing so.

From the amount of the current with which the plaintiff's fence was charged, it is clear that the fence near the transmission line and upon which the broken cable fell had not been properly grounded, and we incline to the opinion that the court would have been justified in concluding from the testimony of appellant's witnesses that the company had failed to use even ordinary diligence in an effort to ground the wires. But whether or not the trial court erred in assuming that the company was guilty of negligence in failing to properly ground the wire does not affect the liability of the appellant if, as we think, it was guilty of negligence upon the other two grounds alleged, viz., the breaking of the wire and the inefficiency of and failing to adjust the circuit breaker. The rule is that, where plaintiff seeks to recover upon several grounds of negligence and establishes by proof the right to recover upon only one ground, the failure to establish negligence as to the other grounds does not require a reversal. Texarkana & Ft. Scott Ry. Co. v. Rea (Tex. Civ. App.) 180 S. W. 945. A party is never required to prove all the facts alleged. If the evidence introduced makes out a prima facie case, the proof is sufficient.

The seventh issue submitted is: "What sum of money, if paid now, will reasonably compensate the plaintiff for the injuries, if any, sustained by her on the occasion in question?"

This issue was accompanied by the following instructions: "In answering this issue you may take into consideration the following matters or such of them, if any, as have been proven and none others, to-wit: (a) Pain, if any, of body or mind that said plaintiff has suffered in the past or will suffer in the future as the result of her injuries, if any; (b) Loss of capacity, if any, to work that said plaintiff has suffered in the past or will suffer in the future as the result of her injuries, if any."

Objections were made to this part of the charge because it authorized the jury to consider future pain of body or mind when the evidence was too general and indefinite to afford any basis or any conclusion as to the extent or duration of such future pain, and further that it was not a competent element of damages, and especially that pain of mind was not a factor under the law and the record in the case.

As we understand the rule, mental, as well as physical, pain and suffering, accompanying or following physical injuries, are proper elements to be considered by the jury in estimating the damages to be awarded in a personal injury action where it is shown that such mental suffering was the result of a wrongful act on the part of the defendant. Missouri, K. & T. Ry. Co. v. Warren (Tex. Civ. App.) 39 S. W. 652; Id., 90 Tex. 566, 40 S. W. 6; Texas & P. Ry. Co. v. Crockett (Tex. Civ. App.) 298 S. W. 654. In cases of this character, where it is shown that illness, nervousness, or bodily pain has resulted from the injuries complained of, mental suffering will be implied. Turner v. McKinney (Tex. Civ. App.) 182 S. W. 431; Gulf, C. & S. F. Ry. Co. v. Levy, 59 Tex. 563, 46 Am. Rep. 278; Chicago, R. I. & G. Ry. Co. v. Smith (Tex. Civ. App.) 197 S. W. 614, affirmed (Com. App.) 222 S. W. 1099; and this case holds that, where the complaining party has been crippled or suffered physical injuries, the jury may take into consideration anxiety and suffering from brooding over the results of said injuries. The courts have frequently permitted the recovery of damages where mental suffering resulted from apprehension as to the complaining party's incapacity to support himself and his family. Citizens' Ry. Co. v. Branham (Tex. Civ. App.) 137 S. W. 403; Ft. W., etc., Ry. Co. v. Turney (Tex. Civ. App.) 157 S. W. 274; 13 Tex. Jur. 125.

In addition to the testimony of the plaintiff herself in which she described her mental, nervous, and physical condition both before and after the occurrence involved, three doctors and two of her neighbors, ladies, testified at great length with reference to her physical and nervous condition, and, after carefully reviewing this testimony, we are convinced that it is sufficient to sustain the findings of the jury both as to the facts and

the amount of damages claimed. The testimony shows that Mrs. Dear was frightened when she saw the electrical display on the fences and around her premises. She said she had no idea what caused it. After making several attempts to extinguish the fires which resulted from the surcharged wires, she called her children out of bed, and with them half clad ran to the house of her nearest neighbor. From the fact that she threw the water on the fire at three different times and was instantly knocked down each time, and still did not understand the cause of the trouble, the jury may have very properly concluded that she was greatly frightened by the circumstances. While it is true that no recovery can be had for mere fright which is not attended or followed by physical injuries, that rule has no application here. The evidence is sufficient to show that, in addition to the burn on her left arm caused by coming in contact with one of the charged wires when passing through the gate, other evidence unquestionably shows physical injuries, the extent of which and the amount recoverable by way of compensation were matters which the jury has settled, and we do not feel authorized to disturb the finding. The case was tried about one year after she was injured. She said she had pains all through her back and down her limbs, and at times had terrible feeling in her head and down her spine; that at times pains were in her face and tongue and throat, almost smothering her, and, if she took any vigorous exercise, she would turn blind, her heart would beat too fast, and she became completely exhausted; that, when she attended to the duties of her house and farm, she suffered pain; that she had to perform these duties because there was no one else to do so. One of her neighbors, Mrs. Simmons, stated that prior to the occurrence Mrs. Dear was always full of faith and seemed vigorous and spry, and afterwards she seemed drawn and did not get about naturally at all; that she was nervous and her brow was drawn like she was suffering. Another neighbor, Mrs. Williams, stated that prior to the occurrence Mrs. Dear seemed to be a healthy woman and could do her work, and after the accident she was pale and could not do any work. Dr. R. D. Gist, who examined Mrs. Dear after the occurrence, stated that in his opinion a violent injury such as had been suffered by Mrs. Dear might have resulted in the retroversion of her uterus. He said he did not think she would ever get well until she was operated on; that the first operation would be the repair of the lacerations which were the result of childbirth. After that operation, the surgeon would have to be governed by the interabdominal conditions as to what further procedure would be necessary, and would be governed largely by what was found at the time of that operation, and that one,

two, or three operations of the abdomen might be required.

As said in Dallas Ry. & Terminal Co. v. Davis (Tex. Civ. App.) 26 S.W.(2d) 340, 344: "The rule seems to be well established that, where the pleading shows the injury sustained, and the evidence shows the injury to be serious and probably permanent, the jury might consider mental suffering, if any. The evidence shows physical pain and suffering for more than a year and up to the time of the trial, and that the physical condition will probably continue for an indefinite time beyond the time of the trial with the probability of an operation. Mental and physical pain will be implied with the continued illness."

In this connection the appellant complains of the court's explanatory charge because it submits the elements of physical and mental pain in the past and in the future, together with loss of capacity to work in the past and in the future without separating them. No error is shown by the court's action in so doing.

The Commission of Appeals held in International-G. N. Ry. Co. v. King, 41 S.W.(2d) 234, that such method of submitting the elements of damage did not constitute error, nor did it permit a double recovery, and would not confuse and mislead the jury. The court said, after reviewing the authorities bearing upon the question, that a separate submission of each element of damage in a suit to recover compensation for personal injuries was calculated to confuse and mislead the jury and to cause findings amounting in the aggregate to be a different sum from that which would have been found if only a single finding of damages had been made.

The appellant asked the court to give the following charge in connection with said issue No. 7: "You are instructed in connection with the Court's Special Issue No. 7, that if you believe that a person of ordinary prudence if troubled with retroverted uterus would have an operation performed for such condition and that such operation would, with reasonable probability, cure plaintiff's condition, if any, and the symptoms, if any, caused thereby or would bring plaintiff substantial benefit, then in making any answer to said special issue you will bear in mind plaintiff's said opportunity, if any, to secure relief of her condition, if any."

This charge was refused by the court and we think properly, for several reasons: First, it assumes that the retroversion was the result of the injuries; that the conditions required the performance of only one operation, and that plaintiff was physically and financially able to submit to the operation. It is true that an injured party must protect himself from the injurious consequences of the wrongful acts of another if he can do so by

ordinary effort and care and at a moderate expense, which expense may be charged against the wrongdoer; but he is only required to use reasonable care and prudence in doing so and in securing a physician for the treatment of such injuries. The proffered instruction was also properly refused because it is a general charge upon matters which should have been submitted by special issues.

The appellant's contention that Mrs. Dear was guilty of contributory negligence in throwing the third bucket of water for the purpose of extinguishing the burning fence post after she had been knocked down twice is without merit. As heretofore said, she did not know the cause of the fire, nor did she understand why she was thrown to the ground when she threw the water on the fire. There can be no contributory negligence in the absence of knowledge of the danger. Moreover, the evidence shows that she was excited and frightened, and was making a frantic effort to save her fences and especially her house from being destroyed by fire. She should not be charged with contributory negligence in throwing the third bucket of water or in any other act performed by her under such stressful circumstances. She was acting in an emergency and trying to save her property. 20 R. C. L. 133–136.

The alleged errors, if, indeed, they can be called errors, with reference to the testimony of the witness Bott who testified as an expert, are harmless in view of the disposition we make of the case.

No error is shown by the propositions based upon the misconduct of the jury in discussing the supposed fact that she would probably have to pay her attorneys' fees out of any amount which she might recover, since the record shows that this discussion took place after the verdict had been agreed upon, written, and signed.

We find no reversible error, and the judgment is affirmed.

MARTIN, J., disqualified, not sitting.