82 P.2d 257

## MARES v. NEW MEXICO PUBLIC SERVICE CO.

### No. 4299.

Supreme Court of New Mexico.

May 4, 1938.

Rehearing Denied Aug. 23, 1938.

476

Floyd W. Beutler, of Taos, and J. O. Seth and A. K. Montgomery, both of Sante Fé, for appellant.

H. A. Kiker and A. M. Fernandez, both of Santa Fé, for appellee.

BRICE, Justice.

The question is whether a judgment entered for appellee, following a jury verdict of $12,000 for the alleged negligent killing of his intestate, is erroneous for either of the several reasons referred to in this opinion.

Certain facts alleged in the complaint, and others stated in appellant's brief, are not controverted; and from these we deduce the following as material:

Appellee is the administrator of the estate of Corina Mares, deceased. The appellant is a New Mexico corporation which, at all times mentioned in this proceeding, was engaged in the business of generating and distributing electric current in the village of Taos and surrounding country; and for such purpose owned, controlled, and managed transmission lines, among which is one that runs from the village of Taos westerly for a distance of several miles to a place called Ranchitos. This line follows a winding road out of Taos about three miles to a pole set at the southeast corner of the property of Vicente Mares, located on the north side of the road. At this pole the line divides. The main line follows the Ranchitos road, which at this pole makes an almost right-angled turn to the west; and the branch line runs in a southerly direction along the west side of a road, intersecting here from the south, for a distance of about one-third of a mile to the residence of J. P. Brandenburg. This line crosses the Ranchitos road from the pole mentioned, and was fastened to the next pole along the Brandenburg road, about 140 feet distant; and then on to and past the Brandenburg house. The Ranchitos road forms the north boundary, and the Brandenburg road the east boundary, of what is known as the Carabajol pasture, which is fenced with a barbed-wire fence. The transmission line going to the Brandenburg residence runs along the east boundary of the pasture, close to and above this fence.

The appellee's intestate, a girl between thirteen and fourteen years of age, intending to remove horses from the pasture, attempted to open a wire gate in the fence forming the north boundary of the Carabajol pasture. At that time one of the two wires composing the branch transmission line, which had been previously broken between the pole from which the transmission lines branched, and the next pole 140 feet away on the Brandenburg road, was resting across the east and north fence lines of the pasture, but not touching the ground; making the third side of a triangle formed by it and the two lines of fence running from the corner of the pasture west and south. The gate which appellee's intestate attempted to open was made of wire and at that time was charged with electricity caused by the fence wires coming in contact with the broken high-tension wire of appellant, which resulted in her immediate death by electrocution. A cow in the pasture was shortly thereafter electrocuted by coming in contact with the fence wire.

Testimony regarding other facts will be mentioned in the course of the opinion.

One charge of negligence in appellee's complaint is in the following words: "That on the 18th day of September, 1933, at a point where said line of poles and wires crosses the public road leading from the Village of Taos to Ranchitos Arriba and where said line of poles and wires runs in line with and directly above the fence of one Mrs. Prudencia Carabajal, on the west end of the Village of Taos, and at a place where people travel daily, the defendant negligently, carelessly and with a reckless disregard to consequences and the rights and safety of plaintiff's intestate and others traveling and being daily in the immediate vicinity thereof, suffered one of the said wires to be and remain in contact with the wires of said fence, within a few feet of said public road, while said electric wire was charged with and conducting a high and deadly voltage of electricity, then and there and thereby carelessly and negligently causing said fence, for several hundred feet along the south side and within a few feet of said public road to and including a wire gate opening into said road, to be and remain charged with a high and deadly voltage of electricity."

The district court held that the rule res ipsa loquitur applied, and so instructed the jury. Was this error? It no doubt was correct if permissible under the state of the pleadings. Anderson v. Eastern Minnesota Power Co., 197 Minn. 144, 266 N. W. 702. But does appellee charge specific acts of negligence; and if so, then does the rule apply? If appellee charged negligence in general terms only, the district court did not err in the premises. See annotations in 79 A.L.R. beginning at page 48.

Appellee's contention is thus stated: " * * * We have not pointed out the specific act of negligence by which it was suffered to be in contact. Whether it was a lack of proper devices to determine that the line was out of order, negligence in attending to such devices, if any, negligence in making discovery, or negligence in removing the contact after discovery, we do not know and do not specify. Neither do we specify that the negligence was defective wiring, defective construction, poor material, that the wires were strung too loose or too tight, or that there were not sufficient trained employees to properly maintain the line. We do not even allege that the wire broke. This is typically a case where we were not in position to say, and in which the rule of evidence res ipsa loquitur applies with full force."

But it would not matter whether any negligence entered into the breaking of the wire, if the appellant was negligent in failing to remove the wire from contact with the fence. Let us assume that the breaking of the wire was not caused by any negligent act of appellant; yet if it knew, or should have known in the exercise of due care under the circumstances, that the wire had broken and had electrified the fence, and with this knowledge, actual or implied, permitted it to remain

longer than was reasonably necessary to remove it, the appellant would have been negligent.

Appellee alleged that appellant *"suffered its wires to be and remain* in contact with the fence." The contentions are over the word "suffered." If appellee had used the word "caused" instead, the question could not have arisen; for unquestionably the charge of negligence would have then been general. But appellant urges that "suffered" means "permitted," and therefore implies "knowledge"; from which it is contended that a specific act of negligence is. charged, and cites Sanders et ux. v. Carthage, 330 Mo. 844, 51 S.W.2d 529, and Rice v. White et al., Mo.Sup., 239 S. W. 141, and other cases, to support its contention. On the other hand, appellee cites May Dept. Stores Co. v. Bell, 8 Cir., 61 F. 2d 830; Keady v. Stix, Baer & Fuller Co., Mo.App., 15 S.W.2d 379; Price v. Metropolitan Street Ry. Co., 220 Mo. 435, 119 S.W. 932, 132 Am.St.Rep. 588; Malloy v. St. Louis & S. R. Co., 173 Mo. 75, 73 S. W. 159; Porter v. St. · Joseph Ry., etc., Co., 311 Mo. 66, 277 S.W. 913; Kuether v. Kansas City Light & Power Co., 220 Mo. App. 452, 276 S.W. 105; Washington v. Ravel, Tex.Civ.App., 14 S.W.2d 367; Mintzer v. Wilson, 21 Cal.App.2d 85, 68 P.2d 370, 371; Francisco v. Circle Tours, etc., Co., 125 Or. 80, 265 P. 801; Pennsylvania Co. v. Clark, 6 Cir., 266 F. 182; Texas-La. Power Co. v. Daniels, Tex.Civ. App., 61 S.W.2d 179; Kendall v. People's Gas & Fuel Co., La.App., 158 So. 254, a number of which hold that the allegations in the complaints are general notwithstanding the use of the words "suffer" or "permitted," etc., in describing the cause of the injury.

The subtle distinctions advanced by the parties regarding the meaning and effect of the word "suffered," as used in the complaint, need not be disturbed by a decision of this court; as from the view we take it is unnecessary to a determination of the case. Paragraph 6 of the complaint is: "That at said time and place plaintiff's intestate, while attempting to open said gate, and without knowledge of, or warning as to, the condition of said wire fence and gate, and without fault on her part, came in contact with, and received an electric shock from said wire fence and gate, so charged with electricity as aforesaid, from which shock, and as the proximate result thereof and of the culpable carelessness, recklessness and negligence of defendant, plaintiff's intestate died, to the damage, etc. * * *" This is a general charge of negligence. In fact, it is the only charge that the negligence of appellant was the proximate cause of the child's death. It is charged in paragraph 5 that the wires of the fence were electrified through the negligence of appellant; and in paragraph 6 that the child came to her death by reason of contact with such wires. But the charge of negligence in paragraph 6 is general and covers any negligence that might be the proximate cause of the child's death, whether that of suffering the wires to electrify the fence, the breaking of the

wire, or any other act that could have been a proximate cause of her death. Appellee did not attempt to prove specific negligence, and apparently tried his case upon the theory that his allegations of negligence were general. This seems to have been the theory upon which the district court submitted the case to the jury. But for the purpose of a decision we will assume that specific acts of negligence as well as negligence generally were charged.

The principal question is whether, under a complaint charging both specific and general negligence in the same count, the rule of res ipsa loquitur could properly be submitted to the jury.

As suggested by appellant, "The authorities are in hopeless conflict on the application of the rule." The cases are collected in an annotation in 79 A.L.R. beginning at page 48, from which the annotator deduces the following varying rules:

"Some cases go to the one extreme, and hold that, if the case is a proper one for the application of the doctrine, the plaintiff, by pleading the particular cause of the accident, in no wise loses his right to rely upon the doctrine."

"Other cases go to the opposite extreme, and hold that a plaintiff, by merely alleging specific acts of negligence, precludes himself from relying upon the doctrine; at least the language used by the courts seems to admit of no other interpretation."

"Another class of cases holds that, where a plaintiff makes specific allegations of negligence, he must rely for his recovery upon such specific acts of negligence, and cannot recover for any other negligent acts; but he is not deprived of the benefit of the doctrine of res ipsa loquitur to establish his specific acts of negligence. * * *"

"Still another class of cases holds that alleging specific acts of negligence does not preclude reliance upon the doctrine of res ipsa loquitur where general negligence is also alleged."

The annotator says of the strict rule (the second quoted): "This rule, however, seems rather harsh. In a jurisdiction in which general allegations of negligence are sufficient, it would seem unfair to the plaintiff, in an otherwise proper case for the application of the maxim, simply because he has alleged a particular act of negligence, to deprive him of all right to rely upon the doctrine and compel him to establish such negligence by direct proof, although the defendant would have been compelled to rebut that negligence, as well as all other negligence, had the plaintiff confined his pleadings to general allegations of negligence."

A majority of the cases (more than half are from Missouri; others from the federal courts, Alabama, California, Illinois, Kansas, Montana, and Texas) have favored the strict rule. On the other hand, a majority of the courts favor the first or fourth rule. See cases cited in the annotation mentioned from Arkansas, California, Connecticut, Hawaii, Michigan,

New Jersey, New York, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Utah, Vermont, Washington, Canada, United States, Illinois, Indiana, Iowa, Massachusetts, Minnesota, Texas, and Virginia.

Some of the cases hold that the rule does not apply unless the specific and general charges of negligence are alleged in separate counts. Rauch v. Des Moines Electric Co., 206 Iowa 309, 218 N.W. 340; Burdette v. Chicago Auditorium Ass'n, 166 Ill.App. 186; McDonough v. Boston Elevated R. Co., 208 Mass. 436, 94 N.E. 809.

There is no requirement in this jurisdiction that separate counts be used in pleading a single cause of action. If there was more than one act of negligence that was the proximate cause of the death of the child, all could have been proven under the general charge. "There is no provision of the code requiring a plaintiff to state in separate counts the several distinct matters upon which he relies to support a single cause of action. Consequently, in an action for personal injuries, common-law and statutory negligence may be stated in the same count, so long as the acts upon which plaintiff relies produced the one injury and the one damage constituting the subject matter of the action. * * *" 1 Bancroft's Code Pleading, § 116.

The facts constituting a cause of action are required to be stated in ordinary and concise language, N.M.Sts.1929, § 105-404, and the pleading is to be construed "with a view to substantial justice between the parties," N.M.Sts.1929, § 105-524. Consistently with these statutes and the policy of this court from the beginning, we hold that the district court did not err in his conclusion that the rule res ipsa loquitur was applicable under the pleadings and facts of this case. In re Morrow's Will, 41 N.M. 723, 73 P.2d 1360, 1361. The following cases support our conclusion: Angerman Co. v. Edgemon et ux., 76 Utah 394, 290 P. 169, 79 A.L.R. 40; Kleinman v. Banner Laundry Co., 150 Minn. 515, 186 N.W. 123, 23 A.L.R. 479; Union Gas & El. Co. v. Waldsmith, 31 Ohio App. 118, 166 N.E. 588; Nashville I. R. Co. v. Gregory, 137 Tenn. 422, 193 S.W. 1053; Guildford v. Foster & Davis, 131 Okl. 148, 268 P. 299; Rapp v. Butler-Newark Bus Line, 103 N.J.L. 512, 138 A. 377, affirmed in 104 N.J.L. 444, 140 A. 921, and annotations in 79 A.L.R. 49 and page 59.

The remaining question is whether the inference arising from the rule res ipsa loquitur was overcome by appellant's evidence.

Notwithstanding the rule was applicable, the burden of proof did not shift to appellant. This court, however, will not disturb the verdict of the jury on the facts, unless the evidence of the appellant introduced to overcome the inference is so clear and convincing that reasonable minds would not differ in their conclusions; in which case it would have been the trial court's duty to have instructed a verdict for defendant. Humphrey v. Twin States Gas & Elec. Co., 100 Vt. 414, 139 A. 440, 56 A.L.R. 1011.

■ The rule that persons in charge of instrumentalities dangerous to the public must use a degree of care commensurate with the danger present, or such care as an ordinarily prudent person would exercise under the circumstances, means, in case of operating such dangerous agencies as high-tensioned power lines, a degree of care commensurate with an extremely dangerous agency; one in which death lurks and strikes when most unexpected, and without warning; which means, to say the least, care of a very high degree.

The care to prevent such fatalities as the death of this child, and lesser injuries, must begin with the construction of the plant, and continue with its operation, maintenance, and replacement. All must be carried on with that degree of care which the nature of the business would cause a reasonably prudent man to exercise under the circumstances, having in mind the dangers to be guarded against.

■ The first inference of negligence which appellant was required to meet was its failure to remove the broken wire from the fence; either because of delay after knowledge of the facts, or because of its failure to discover the danger within a reasonable time after the wire was broken.

Appellant's witnesses the Brandenburgs, testified the lights in their house went out between 6:15 and 6:30 p. m.; that they had just sat down to the table when the lights became dim, then regained their normal brilliance, became dim again, flickered, and continued to become dimmer until they went out. Mrs. Brandenburg stated that she did not know the condition of the lights before she sat down to the table. From this testimony it may be inferred that the lights had just been turned on when they first began to dim. Appellant's manager, Gaylord Burt, gave expert testimony to the effect that when the wire broke, the lights went out along the line. Paul Burt testified that he passed the pole on his return to Taos at about five minutes after 6 and the wire was not broken. Gaylord Burt testified he was notified of the accident between 6:20 and 6:40 p. m. and that the current was cut off within half a minute. As will be seen, the time overlaps, but taking the maximum, this evidence would indicate that the current was cut off within twenty-five minutes after the breaking of the wire.

The appellee's testimony shows that the wire had been broken before the child attempted to open the wire gate. After the killing of the Mares child, her sister went to the home of Mr. Oakley, a distance of 240 steps. Mrs. Oakley returned with her to the scene of the accident; went back to the house to get her husband, who came back and cut the chain at the gate and then returned to his home. The cow that had been electrocuted had not been killed at the time he left the scene. This required time to travel about a thousand steps.

A Mr. Gomez, who lived a half mile away, was told by a person passing of the accident. "After a little bit" he walked to the place. After he arrived the cow was

electrocuted, so he must have arrived after Oakley had left.

Santiago Salazar, the deputy sheriff, was at the sheriff's office when the accident was reported to him. He went out to the scene of the accident a mile away, saw the cow electrocuted, and returned to Taos and told Gaylord Burt of the accident. The child's father testified that the accident occurred between 4 and 5 o'clock, but stated further that it was beginning to get dusk at the time.

It is argued by appellee that all of these circumstances could not have occurred within the twenty-five minutes fixed.

Appellee argues that the country is water-logged, as shown by the testimony; and that the fence posts were conductors (or ground wires), which could have established a circuit and thus have kept the lights at the Brandenburg house burning after the wire had broken; that the lights burned bright after the accident, at least momentarily; and further:

"True, Mr. Burt testified that at the time they examined the wire it was not touching the ground, but the fence wires may have been grounded at some place. Mr. Oakley saw smoke at two different places on the ground along the Carabajal fence. The fence posts no doubt provided some ground, and as the jury and the court saw from a view of the premises, that river bottom is irrigated so much and is so water-logged that it is boggy in places. On re-direct examination, Mr. Paul Burt said,

with reference to the guying and keeping of poles straight, 'the water is so close to the ground that you can't do anything with them.'

"A ground on the fence along the Ranchitos line, with an accidental ground by means of a tree or otherwise on that electric line, would likely complete the circuit. Indeed, in that wet country, the electricity may have traveled through the earth from a ground on the fence to the usual ground at the plant. That electricity is conducted to the earth by accidental grounds such as trees and travels through the earth, particularly wet earth, back to the generator, is a well established fact."

In meeting the inference that appellant's negligence was the proximate cause of the severance of the power line, appellant introduced evidence tending to prove that the wire was broken by the impact of an automobile against the post mentioned, and advances no other theory or explanation. The evidence regarding this theory as the cause of the breaking of the wire is in substance as follows:

Paul Burt, an employee of the appellant, testified that between 5 and 6 o'clock on the evening of the day the child was killed, he drove along the road within some eight feet south of the pole where the break occurred in the line, examining the poles and wires and attempting to locate the trouble for which he had been called from the end of the line about three miles from Taos. He returned to the power plant at Taos along the same route, arriving there at ap-

proximately five minutes after 6. He inspected the lines and poles, both as he went and as he returned to Taos. At both times the line in question was still up and he noted nothing wrong with either the pole or the wires. That on the morning after the accident he noticed that the pole in question had a piece ten inches wide torn out of it about four feet from the ground; that the pole appeared to have been pushed back from the road, leaving a space of two inches between the post and the dirt. That this mark was not on the pole when he inspected it the previous afternoon. He called no one's attention to the space between the pole and dirt at any time. The appellant's witness Brandenburg testified, also, to seeing the gash on the pole; and stated that it was fresh, but possibly had been made several days; that in his opinion it had been made by a collision with a car.

Gaylord Burt testified as to the appearance of a wire that has been broken from rust or defect such as kinks, or having been cut, or broken from a stretch, pull, or blow. His opinion was that this wire had been broken from a stretch or pull, corroborating the other witness Burt, who testified to the condition of the ground around the pole and marks on it.

There was 137 feet of wire attached to the pole south of the road, which fell across the fences and caused their electrification.

Two witnesses for the appellee, living close to the place of the accident, testified that two evenings before the Mares child's death they saw sparks, which from the description of the location seemed to be coming from the pole in question, following a crash "like something being struck." The lights in their house went out with the crash, but came on again in fifteen minutes. It is contended by appellee that this accounted for the gash on the pole.

The appellant's employees, Gaylord Burt and Conrad, testified that the plant was equipped with an automatic oil circuit breaker, which was the latest and best device made for its purpose; that if the wire had touched the ground it would have registered at the plant, and have broken the circuit, but not otherwise. Appellee contends that as it had inspected the line within an hour of the accident, and its circuit breaker is the best, that it was not guilty of negligence.

According to the testimony of appellant's witness and manager, Gaylord Burt, the power line in question was strung on posts set inside the roadway, and near the wire fence along its boundary. He constructed the power line, and knew at that time that if one of the wires should break from any cause, it would in all probability drop onto a fence; that each wire fence in that community above which there happened to be an electric wire would, in case of a broken wire, become a carrier of a deadly charge of electricity, and that was what occurred when the Mares child was killed; that he never saw as many wire fences anywhere as there are around the Taos community; that no "ground wires" were attached to any of the wire fences along which the

power line ran. The poles used were thirty feet long (or longer) with a six-inch top.

The evidence shows that the pole from which the south power line branched was placed in the roadway (not in the road) where the road and power line make a right-angle turn.

The only witnesses who testified for appellant were its employees, the Brandenburgs, and the deputy sheriff. Mr. Brandenburg was a partner of appellant's counsel, and the sheriff's testimony is of little value on the question to be answered.

If the wire was not broken by the impact of an automobile with the pole, then the cause of the break is unknown, or unexplained.

The jury was permitted to view the place of the accident, and may have concluded that the appellant's theory regarding the cause of the wire breaking was so contradicted by the testimony of appellee's witnesses, and certain unusual circumstances connected with his testimony, that it was rejected. Burt testified that he saw no car tracks at the pole, but that the road was dry, though it had rained over an hour the afternoon of the accident. No other witness testified to car tracks at the pole or that it had been pushed over, though Brandenburg and Gaylord Burt examined it and saw the gash, but apparently did not see that it had been pushed over two inches at the base.

There is just as strong evidence, if not stronger, against appellant's theory that the wire was broken because of the collision of an automobile with a pole. With this out of the way there is nothing to show by what means the wire was broken. "The parting of the wires is sufficient evidence to put upon the defendant the burden of proving that it had exercised due care in construction, maintenance, and inspection." Edwards v. Cumberland County Power & Light Co., 128 Me. 207, 146 A. 700, 703.

We approve the following statements regarding the duty of a conveyor of electricity:

"The defendant in carrying on the business of selling and conveying over its wires a dangerous electric current, while not an insurer of the safety of those who might rightfully use the same, was required to exercise a high degree of care to protect those likely to come in contact therewith commensurate with the dangerous character of, and consistent with the practical operation of, the business. That duty extended not only to the erection, maintenance and operation of its plant and apparatus, but likewise to inspection thereof to discover defects." Dierks Lbr. & Coal Co. v. Brown, 8 Cir., 19 F.2d 732, 735.

"A vendor of electricity, engaged in the distribution of current over its lines to consumers, is bound to exercise due care and diligence in construction, maintenance, inspection and operation of its lines, and in selection, installation, and inspection of its appliances, so as to afford to the con-

sumer assurance of a reasonable degree of safety." Edwards v. Cumberland County Power & Light Co., 128 Me. 207, 146 A. 700, 702.

A photograph introduced in evidence in this case shows that the pole about which so much has been said, was placed just at the edge of the traveled road within the roadway, where it could easily be struck by an automobile. There are seven lines of wire fencing radiating from this place, and close enough to this pole for one or more of them to catch a severed wire attached to it. The roadway is very narrow. Appellant's manager built this power line. His testimony shows that he realized at the time he built it that if any wire on this line should break it would, in all probability, electrify one of the various wire fences along the line. The location of this accident was ideal for just such an occurrence, and with this knowledge it was encumbent upon appellee to exercise a corresponding degree of care. Wires may pull in two because of kinks or defective material, or may rust in two, or be torn apart by shocks. See annotation, 84 A.L.R. p. 690 et seq.

Appellant's agent, Gaylord Burt, testified as follows:

"Q. Mr. Burt, you constructed this line which runs along the Camino Del Medio, and also the one which runs along the Camino de Ranchitos Arriba. A. Yes, sir.

"Q. And you knew at all times that the wires of the electric light line were immediately above the fence wires? A. Yes, sir.

"Q. On the Camino Del Medio generally? A. Yes, sir.

"Q. And you also knew at all times that if anything should happen to one of those wires it would in all probability drop onto the fence wires? You knew that? A. Yes, sir.

"Q. How many grounds did you put in this wire fence down there on the Carabajal pasture? A. How many grounds?

"Q. Yes. A. I didn't put any grounds in that fence.

"Q. Nearly all of the electric light wires in this whole community follow the wire fences immediately after they get out of the Plaza, do they not? A. They are that way everywhere.

"Q. This raises another question. Did you ever see any other 'where' or any other 'everywhere' with as many wire fences as we have in the Taos community? A. I believe not.

"Q. Now then, in all of these wire fences, from one end of your line to the other, how many grounds has your company put in? A. None.

"Q. Well, then, throughout the history of the electric light plant in Taos every wire fence in this community, above which there happens to be an electric light wire, would become and will become, in the case of a broken wire and if it forms a circuit, a carrier of a deadly charge of electricity, will it not, Mr. Burt? A. Practically, yes.

"Q. That is exactly what did occur down there at the Carabajal pasture where Frank

Mares' little girl lost her life, is it not, Mr. Burt? A. Yes, sir.

"Q. I understand it to be a fact, or is it a fact that this plant was practically all constructed when you took over its management? Is that correct? A. You mean it was constructed?

"Q. Practically all of the distribution system was constructed when you first came to take over its management, was it not? A. I built every foot of it myself."

The jury was then confronted, first, with the problem of whether the defendant should have discovered the broken wire before the child was electrocuted. It may be assumed (though we do not hold that the facts so require) that the jury found no negligence in that regard.

Upon the question of the immediate cause of the parting of the wire, the jury was warranted in a conclusion that it was not caused by the pole we have so often mentioned, being struck by an automobile. As no other theory is advanced by either party, the immediate cause was unknown and unproven. The jury was authorized, therefore, to infer that it was caused by the negligence of appellant, unless the evidence of appellant was such that it negatived the want of that degree of care which the conditions and circumstances required it to exercise.

The verdict of the jury was in effect a determination that it did not exercise the required degree of care. We are not authorized to determine that question here.

That was the province of the jury and the principal purpose of a jury trial. The question here is one of law; that is, whether the evidence of appellant was so clear and convincing that all reasonable minds are compelled to the view that the inference of negligence was met on an even basis, if not overcome.

In determining this question of law, we are to decide whether the casual inspection of the line from a moving automobile an hour before the accident, and the fact that the appellant maintained an approved type of circuit breaker, only effective in case the wire came in contact with the ground (and therefore worthless under the conditions which caused the child's death), is of such force and strength that all reasonable minds must and will conclude that the inference of negligence has been met by sufficient proof of care under the circumstances. The wire presumably was not insulated. The following quotations from authorities are illuminating:

"Nor does the application of the maxim affect the general rule that, when the evidence is so clear and convincing that reasonable minds would not differ in their conclusions therefrom, the question of the defendant's negligence is for the court, and not for the jury. Houston v. Brush, 66 Vt. 331, 347, 29 A. 380. It was said in that case that the maxim does not *apply* to such a case. Perhaps it would be more accurate to say that the maxim does not *avail* in such a case. The thing that defeats the plaintiff is, not that the maxim does not apply, but that

its force and effect are rebutted by the proof.

"A defendant is not required to overcome the prima facie case which the maxim makes of evidence showing the fact of the accident happening in circumstances making the maxim applicable. All he is called upon to do is to produce exculpating evidence of equal weight. Desmarchier v. Frost, 91 Vt. 138, 99 A. 782 [supra]; Scellars v. Universal Service Everywhere, 68 Cal.App. 252, 228 P. 879; Glowacki v. North Western Ohio R. & Power Co., 116 Ohio St. 451, 157 N.E. [21] 24, 53 A.L.R. 1486. In such cases, the plaintiff fails, if the force of the maxim is counterbalanced by the facts disclosed. The trouble with the defendant's position here is that its case does not come within the rule invoked. The evidence tending to negative its negligence was not so decisive as to justify a directed verdict. There was evidence, to be sure, tending to show that the defendant had discharged the duty of care which the law imposed upon it. But the current escaped. Whether the tie wire broke without the defendant's fault, or whether it broke through insufficiency in size and strength, through lack of guying, or through other causes for which the defendant was chargeable, was an open question, too plainly for the jury to merit discussion. Our attention is not called to a single case, within the range of the maxim, in which the proof was such that a defendant's verdict was directed. Indeed, Chief Justice Marshall says in the Glowacki Case, above cited, that no such case is to be found in the books." Humphrey v. Twin State Gas & Elec. Co., 100 Vt. 414, 139 A. 440, 445, 56 A.L.R. 1011.

The facts in Southwestern Light & Power Co. et al. v. Fowler, 119 Okl. 244, 249 P. 961, 962, are quite similar to this case. A power company partially removed a telephone wire from its poles, rolled up the wire, and hung the roll over a fence post and in contact with a fence wire; but the end of the wire remained attached to a pole on which the power company's high-tension wires were strung. A boy placed his hand on the fence wire while watching the burning of his father's house, the fire from which burned the high-tension wire of the power company in two, which fell on the telephone wire, through which the deadly current passed into the fence wire, resulting in the electrocution of the boy. In holding the power company liable for negligence, the court stated:

"The rules of law applicable in this appeal lie within the compass of clear propositions of law, which, to be assented to, need only to be stated. (a) Companies which manufacture and conduct electricity over its high voltage wires, along public highways and the streets of cities, for sale to the consumers, owe the highest degree of care for the safety of persons from the dangers of the deadly agency.

"The following rule is a necessary consequence of the foregoing rule: (b) It is the duty of electric companies in conducting electricity over high voltage wires along public highways and streets, to use

care commensurate with its dangers to confine the deadly agency within its usual and proper zone of travel. * * *

"The cause of the son's death was coming in contact with a wire carrying a high voltage of electricity. The barb wire became charged through contact with a telephone wire attached to a pole carrying the high voltage wire. The telephone wire was so situated and attached to the pole that contact was a probable and natural consequence from the separation of the high voltage wires. The sending of the deadly voltage along the barb wire was a diversion of the deadly current from its normal and usual zone of travel, as the result of a condition of which the appellants stand charged with notice. The burning of the Taylor house was not the proximate cause of the son's death; it was an incident involved in the chain of circumstances which resulted in the untimely death of the son. The barb wire was charged on account of the separation of the high voltage wire, which was a natural and probable consequence of the telephone wire being attached to the pole under the high voltage wire.

"The negligence of the defendant was in permitting a condition which sent the deadly current out of its usual zone of travel. It is not material what concurring cause or means set the dangers in motion, unless the concurring means superseded the negligence of the defendant."

A similar case was before this court in Crespin v. Albuquerque Gas & Electric Co., 39 N.M. 473, 50 P.2d 259, 261. Wires of the electric company were, from some cause, severed in a city park. The electric company claimed it was caused by the rubbing of a tree against one of the wires, destroying the insulation. This came into contact with another from which they were burned in two. A workman in the park took hold of the wire and was wrapping it around a tree when he received an electric shock, for which he sued the city for damages for the injury resulting therefrom. This court through Justice Hudspeth stated: "The evidence, while circumstantial, was sufficient to justify the jury in believing that the break in the line was caused by the tall slender tree being blown against the wires, as outlined above. Hepp v. Quickel Auto & Supply Co., 37 N.M. 525, 25 P.2d 197; Sullivan v. Mountain States Power Co., 139 Or. 282, 9. P.2d 1038. It is not claimed that the storm on the day of the accident was unusual. A high degree of care was required to appellant to maintain the wires intact in the park frequented by men, women, and children. The degree of diligence in proper construction of the power line so as to avoid contact with trees in a public park which would result in the parting of the wires, and in the removal of menaces of this sort which was necessary to constitute due care was, partially at least, a question of fact for the jury. Gilbert v. New Mexico Construction Co., 39 N.M. 216, 44 P.2d 489. In Runkle v. Southern Pacific Milling Co., 184 Cal. 714, 195 P. 398, 399, 16 A.L.R. 275, it is said: 'It is idle to

discuss upon appeal to this court the weight of the evidence upon which the judgment rests, and, of course, it is only when the facts of a given case are not in any event or in any view of the case susceptible to the inference of negligence sought to be deduced therefrom that the question of negligence becomes one of law for the sole consideration of the court rather than one of fact for the determination of the jury.' "

The case of Newark Electric Light & Power Co. v. Ruddy, 62 N.J.L. 505, 41 A. 712, 57 L.R.A. 624, Ruddy v. Newark Electric Light & Power Co., 63 N.J.L. 357, 46 A. 1100, 57 L.R.A. 624, is quite similar, from which we quote: "The plaintiff, a child of eight years, picked up from the sidewalk of a public street the end of a broken wire that trailed from one of the poles on which it should have hung suspended, and sustained severe injury through electric shock. The wire was an electric light wire, under the control of the defendant. * * * The defendant was, by law, permitted to suspend along a public street a wire so charged with electricity as to be dangerous to the public if it should break and fall upon the street. This privilege entailed upon it a very high degree of care to maintain the wire intact. It was permissible to presume a lack of exercise of such care when the proof showed the wire broken and trailing on the sidewalk under conditions that rendered possible serious injury to persons lawfully there. Unexplained, the presence on the highway of the charged and broken wire, and the fact of injury received therefrom, justified an inference of negligence in the defendant in whose control and management it was. Such an inference has been judicially permitted even when the wire that broke received the electricity from a wire on which it fell. Haynes v. Raleigh Gas Co., 114 N.C. 203, 19 S.E. 344, 26 L.R.A. 810 [41 Am.St.Rep. 786]. * * * It happened that the plaintiff was able to produce no witness who had noticed that the wire was down except within five or ten minutes before the plaintiff took it up, and it was argued that so short a space of time forbade any presumption of negligence in not removing it. This argument is beside the point. The plaintiff was not bound to prove when the wire came down. Its presence at the time and place of injury sufficed. Had it appeared affirmatively that the wire had but just fallen, the presumption of negligence would have been simply narrowed to the breaking of the wire. Only in case it had appeared that the breaking was without negligence would the question of reasonably prompt removal have arisen. We may assume that such a wire, of proper size and quality, skillfully set up and inspected with sufficient care and frequency, will not spontaneously break, and, on the other hand, that undue strain or improper use may weaken such a wire, and cause its fracture. There remains the possibility of disruption caused by the elements or outside interference. * * * In the case before us, how could the plaintiff have shown that the wire 'part-

ed without any apparent reason other than its own weakness?' He had no control over, or power or opportunity to examine and test, it. Proof that the fracture must have come from external violence was peculiarly within the province of defendant. It could have proved when and how the wire was put up; to what usage it had been subjected; how often, how carefully, and how recently it had been inspected, and what its appearance after disruption indicated. In short, the defendant could have exonerated itself from the prima facie case made against it if exoneration had been possible. The plaintiff was not called on to conjecture and disprove possibilities of exoneration."

The court stated in Boyd v. Portland Electric Co., 40 Or. 126, 66 P. 576, 577, 57 L.R.A. 619: "The plaintiff gave evidence tending to show when the wire which caused the injury to his son fell and the circumstances surrounding the accident, but gave no direct evidence of the specific acts of negligence charged in the complaint. * * * As a general rule, where the thing which causes injury is shown to be under the management of the defendant, and the accident is such as in the ordinary course of events would not happen if he had used proper care, it affords reasonable evidence, in the absence of a satisfactory explanation, that the accident arose from a want of care. Esberg Cigar Co. v. Portland, 34 Or. 282, 55 P. 961, 43 L.R.A. 435, 75 Am.St.Rep. 651. This doctrine is held applicable in actions for injuries received from contact with a live electric wire in a public street. Electricity is a dangerous element, and those who make merchandise of it are legally bound to exercise that degree of care that will render its use reasonably safe; and, as the wires which convey it cannot safely be permitted within reach of travelers, a presumption arises, when they are found out of their proper place, that those having them in charge have been negligent. The courts quite universally hold that proof that a live wire was down in a street and injury resulted therefrom is prima facie evidence of negligence. [Citing cases.] * * * In the case at bar, it probably would have been sufficient, if the plaintiff had specified in the complaint generally the act or omission which he alleges to have been the proximate cause of the injury, and averred that it was negligently done or omitted. But, since the wire which caused the injury would not, presumably, have parted and fallen down, in the ordinary course of events, unless it was either defective or improperly stretched or fastened, it is reasonable to presume that its position in the street was owing to one or all of these causes. It must be assumed that a suitable wire, properly put up, would not be a menace to travelers on the highway; otherwise, the operation of a light plant by wires supported by poles in the streets of a city would be ipso facto a nuisance, and an unauthorized interference with the rights of the public. If, therefore, the wires break and fall down, that fact in itself affords reasonable evidence of negligence, either in the use of defective wires or in the manner

of putting them up, and calls upon the defendant to show that it was without fault. * * * It is argued, however, that, if proof of the accident was sufficient under the pleadings to make out a prima facie case in favor of the plaintiff, it was overcome by the testimony of the defendant. But the weight, value, and credibility of such testimony were for the jury, and the court could not properly have taken the case from them on the ground that the defendant had shown by its employee that the accident occurred without fault on its part. In a recent case in New York, where a trolley wire fell, injuring a traveler it was held that the presumption of negligence on the part of the company, arising from the fall of the wire and the happening of the accident, was not overcome by the evidence of interested persons that the supports were the best obtainable, that the line was frequently inspected, and an automatic device called the 'breaker system' was in use, which, if properly adjusted, would automatically cut off the current if the wire touched the ground; the credibility of the witnesses and the sufficiency of the device being questions for the jury."

It is useless to multiply cases. The danger to the public from electric power lines is best proved by the hundreds of cases in the books. But few communities in this country have not had electrocutions from electric current out of control. See annotations, 84 A.L.R. 690, 14 A.L.R. 1023, 56 A.L.R. 1021, and American Digest System, Electricity, ☞14(1) and 14(2).

The rule of conduct in such cases, reduced to a few words, may be thus stated: A power company maintaining transmission lines along a public highway has the duty to install and maintain the proper appliances, make reasonable and proper inspection of its lines, use diligence to discover and repair defects, and the construction of its lines and transformers must be as free from danger to the public as practical operation of the plant will permit. This requires a high degree of care. Illinois Power & Light Corp. v. Hurley, 8 Cir., 49 F.2d 681; Alabama Power Co. v. Sides, 229 Ala. 84, 155 So. 686; Southern Colorado Power Co. v. Pestana, 80 Colo. 375, 251 P. 224; Georgia Power Co. v. Stonecypher, 47 Ga.App. 386, 170 S.E. 530; Kentucky & West Virginia Power Co. v. Riley's Adm'r, 233 Ky. 224, 25 S.W.2d 366; Mays v. Southwestern Gas & Elec. Co., 174 La. 368, 140 So. 286; Edwards v. Cumberland County Power & Light Co., 128 Me. 207, 146 A. 700; Hindal v. Kahler Corp., 167 Minn. 48, 208 N.W. 524; Faribault v. Northern States Power Co., 188 Minn. 514, 247 N.W. 680; Henry v. Mississippi Power & Light Co., 166 Miss. 827, 146 So. 857; Foster v. Kansas City C. C. & St. J. Ry. Co., 325 Mo. 18, 26 S.W.2d 770; Helms v. Citizens' Light & Power Co., 192 N.C. 784, 136 S.E. 9; Sander v. California-Oregon Power Co., 133 Or. 571, 291 P. 365; Novak v. Borough of Ford City, 292 Pa. 537, 141 A. 496; Town of Lebanon v. Jackson, 14 Tenn.App. 15; Texas Utilities Co. v. Dear, Tex.Civ.App., 64 S.W.2d 807; Scott v. Pa-

cific Power & Light Co., 178 Wash. 647, 35 P.2d 749; Dansbery v. Northern States Power Co., 188 Wis. 586, 206 N.W. 882.

The jury may have concluded that as appellant did not prove the cause of the broken wire, the inference was that it was caused by appellant's negligence, even though it was pulled apart. It may not have had the strength to bear the weight or have been otherwise defective. We cannot see how the circuit breaker would assist appellant in this case, as it was utterly useless. The jury was authorized to conclude from the evidence that appellant had created a situation at the junction of these roads where the breaking of a wire would be almost certain to result in the electrification of one of the several fences close by. Its manager knew this at the time he built the line. No precautions, except that of inspection from an automobile, were taken to protect the public against such an eventuality. The jury may have inferred that the wire at such place should have been properly insulated, or at least that some means to protect the public who had the right to pass along these roads, or persons using their gates, against the dangers which appellant itself had created in the building of this power line. It knew of them, and there is no substantial evidence that shows that high degree of care for the protection of the public that the law demands. We are unable to say as a matter of law that it was not appellant's negligence that caused the line to break.

But assuming that it was not; yet its responsibility existed notwithstanding some intervening cause may have directly brought about the death of this child. After preparing a situation that might result in the death of persons rightfully at this place, it cannot say that its negligence was the remote cause, when it anticipated that the line might be broken either purposely by some third person or through some defect in the wire, from which the danger would follow. Such an intervening cause would not interrupt the connection between the original negligence and the injury. Southwestern Light & Power Co. et al. v. Fowler, supra; Leahy v. Standard Oil Co. of N. Y., 224 Mass. 352, 112 N.E. 950; St. Louis-San Francisco Ry. Co. v. Mills, 5 Cir., 3 F.2d 882; 45 C.J., Negligence, § 493.

A general statement is made in appellant's brief regarding the admission of testimony, in the following words: "The trial court permitted plaintiff's attorney to cross examine defendant's witnesses as to the condition of defendant's poles and wires at places remote from the scene of the accident. See transcript pages 120, 121, 126, 167, 168. These questions related to certain poles in the line and to the line being built through trees, all at places long distances from the point where the accident occurred. No showing was made or attempted to be made that the condition of the lines of defendant at the points indicated had any connection whatever with the accident. Such evidence was not only immaterial and incompetent, but had a ten-

dency to prejudice the jury against the defendant."

The record shows that every objection, but one, made was general, such as that the evidence was "incompetent, irrelevant and immaterial," or "same objection," which raises no question in this court. The objection must be specific; state the grounds or reasons which render the evidence inadmissible. Alvarado Mining & Mill. Co. v. Warnock, 25 N.M. 694, 187 P. 542; 4 C.J.S.; Appeal & Error, § 290, page 570. The one specific objection made was to the following question and answer:

"Q. Do you recall that there has been now for several years a post leaning over at an angle of something like 20 or 30 degrees, hanging largely by the wires at its top, at that corner?

"Q. Is that pole in the condition I have described? A. Not as you have described it, no.

"Q. What is the condition then of that pole? A. It is set on that angle.

"Q. Set purposely on that angle? A. Yes, sir."

We find nothing in this question and answer, even if erroneous, that was prejudicial to appellant.

The last question is whether "the damages awarded by the jury were so excessive as that a remittitur should be ordered or a new trial granted."

This action is brought under sections 36-102 and 36-104, N.M.Statutes 1929, which are:

Section 36-102. "Whenever the death of a person shall be caused by the wrongful act, neglect or default of another, although such death shall have been caused under such circumstances as amount in law to a felony, and the act, or neglect, or default, is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then, and in every such case, the person who or the corporation which, would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured."

Section 36-104. "Every such action as mentioned in section 1821 (36-102) shall be brought by and in the name or names of the personal representative or representatives of such deceased person, and the jury in every such action may give such damages, compensatory and exemplary, as they shall deem fair and just, taking into consideration the pecuniary injury or injuries resulting from such death to the surviving party or parties entitled to the judgment, or any interest therein, recovered in such action, and also having regard to the mitigating or aggravating circumstances attending such wrongful act, neglect or default."

These statutes have been construed in Cerrillos C. R. Co. v. Deserant, 9 N.M. 49, 49 P. 807; and Hogsett v. Hanna, 41 N.M. 22, 63 P.2d 540, 543, in which it was held "that from the proof as to age, earning capacity, health, habits and probable dura-

tion of life, the jury shall say what is the present worth of the life of deceased." This seems to be the majority view. See annotation on the subject in 7 A.L.R. at pages 1314 et seq.; 26 A.L.R. 593 et seq.; 77 A.L.R. 1439 et seq.

 The worth of the life of deceased to her estate is not all that she would earn in her lifetime, but the present worth, taking into consideration the earning power of money.

The leading authority on the question is Chesapeake & O. Ry. Co. v. Kelly, 241 U. S. 485, 36 S.Ct. 630, 631, 60 L.Ed. 1117, L. R.A.1917F, 367, from which we quote:

"The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased. * * * So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. * * *

"We do not mean to say that the discount should be at what is commonly called the 'legal rate' of interest; that is, the rate limited by law, beyond which interest is prohibited. It may be that such rates are not obtainable upon investments on safe securities, at least, without the exercise of financial experience and skill in the administration of the fund; and it is evident that the compensation should be award-

ed upon a basis that does not call upon the beneficiaries to exercise such skill, for where this is necessarily employed, the interest return is in part earned by the investor rather than by the investment. This, however, is a matter that ordinarily may be adjusted by scaling the rate of interest to be adopted in computing the present value of the future benefits; it being a matter of common knowledge that, as a rule, the best and safest investments, and those which require the least care, yield only a moderate return.

"We are not in this case called upon to lay down a precise rule or formula, and it is not our purpose to do this, but merely to indicate some of the considerations that support the view we have expressed that, in computing the damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.

"We are aware that it may be a difficult mathematical computation for the ordinary juryman to calculate interest on deferred payments, with annual rests, and reach a present cash value. Whether the difficulty should be met by admitting the testimony of expert witnesses, or by receiving in evidence the standard interest and annuity tables in which present values are worked

out at various rates of interest and for various periods covering the ordinary expectancies of life, it is not for us in this case to say. Like other questions of procedure and evidence, it is to be determined according to the law of the forum. * * *

"That where future payments are to be anticipated and capitalized in a verdict the plaintiff is entitled to no more than their present worth is commonly recognized in the state courts."

There is some suggestion in Johnson v. City of Santa Fe, 35 N.M. 77, 290 P. 793 (a personal injury case), that the cost of an annuity for plaintiff's decreased earning capacity would be the correct method of arriving at the present value of her damages. The measure of damages is substantially the same in this case. The basis of an annuity is not necessarily the legal rate of interest (Louisville & Nashville R. Co. v. Holloway, 246 U.S. 525, 38 S.Ct. 379, 62 L.Ed. 867); but the plaintiff was entitled to that amount of money which would compensate deceased's estate for the loss of her life. The discount rate should be based upon investments in safe securities, or upon the cost of an annuity. Chesapeake & O. R. Co. v. Kelly, supra.

▮ The district court adopted a different, and erroneous, measure of damages. He instructed the jury that the measure of damages was "only the pecuniary injury or injuries resulting to the surviving brothers and sisters * * * taking into consideration the age of Corina Mares at the time of her death, her life expectancy, her in-

telligence and habits, her health, disposition and condition of life." The law thus stated, had the approval of both parties, and therefore is the measure of damages in this court, right or wrong. Marchant v. McDonald, 37 N.M. 171, 20 P.2d 276.

▮ The evidence established that the deceased was between thirteen and fourteen years of age, in good health, in the fifth grade at school, was of a kindly, happy disposition, and did most of the housework at home and looked after the younger children like a mother. Her life expectancy was 46.16 years. There was no evidence of her earning capacity other than can be estimated from the facts stated. There is some testimony to the effect that her father had intended to send her to school at Denver, so that her earning capacity would probably have been above that of the serving classes.

The deceased had two sisters, aged 22 years and 7 years respectively; and three brothers, one of the age of 17 years who was attending school at El Rito, one of the age of 11 attending school at Taos, and the youngest, under 7 years of age. The oldest girl was attending school in Denver.

The value of deceased's life to these brothers and sisters is largely speculative. Ordinarily, her contribution of labor or money to them would terminate when she reached her majority, though not necessarily so. But if we should assume that it continued for a lifetime, measured by her life expectancy, we find that $12,000 would be $26 per month during deceased's life ex-

pectancy; it would be the present value of an annuity of $55.83 per month based upon a discount rate of 5 per cent., $47.50 per month·on a 4 per cent. rate, and $33.68 on a 3 per cent. rate, during her life expectancy of 46.16 years. It would be quite unusual if such contribution would have been made after she had become of age, and not at all probable after the youngest child should reach the age of 21 years. Assuming that her earning capacity was as much as $100 per month, it is not conceivable that she would have contributed as much as half of it to the care of her brothers and sisters, and any substantial part to a child who had reached his majority.

We are of the opinion that the outside damages to the brothers and sisters was $7,500. The interest on this amount at 5 per cent. is óver $30 per month. Based on a discount rate of 5 per cent. it would produce $35 per month during deceased's life expectancy of 46.16 years—a much longer time than we could ordinarily expect her to contribute to their support.

We conclude that the judgment is excessive in the sum of $4,500.

If the appellee will file a remittitur of $4,500 in this court, a judgment for the difference of $7,500 will be affirmed; otherwise, the cause will be reversed and remanded with instructions that a new trial be granted.

It is so ordered.

SADLER, BICKLEY, and ZINN, JJ., concur.

HUDSPETH, C. J., concurs in the result.

## On Motion for Rehearing.

BRICE, Justice.

It is asserted by appellant that the district court erroneously assumed that the allegations of negligence in paragraph 5 of the complaint, to which we have referred in the original opinion, were general when in fact they were not; that it also appears that appellee and the court tried the case upon the assumption that his general allegation of negligence in paragraph 6 of his complaint was an allegation of proximate cause only; that here he strenuously contends that his general allegations of negligence are contained in paragraph 5 of his complaint, and does not claim that paragraph 6 contains such general allegations; that the trial court was of like opinion.

The theory upon which the case was tried in the district court was that the complaint charged negligence generally. This appears from the evidence and from paragraph 6 of the court's instructions, and is so admitted by appellant in its brief (p. 29).

It is a little difficult to determine just what construction the trial court placed upon the ·pleadings. He gave to the jury the following instruction:

"By the pleadings in the case and admissions on the trial, the issues are narrowed to three, as follows:

"(1) Whether the defendant suffered its wires charged with electricity to be and re-

main in contact with the wires of the fence, and that it did so carelessly, and negligently.

"(2) Whether such negligence, if it existed, was the proximate cause of the death of Corina Mares; and

"(3) The damage, if any, suffered by the beneficiaries of this proceeding, as hereinafter defined."

This instruction indicates that appellant's view regarding the court's construction of paragraph 5 of the complaint is correct. However, the court refused to give appellant's requested instruction No. 6, as follows:

"The whole basis of this action is the claimed negligence of the defendant in suffering the wire charged with electricity to be and remain in contact with the wires of the fence for an unreasonable length of time after it knew or should have known of such contact.

"Before you can return a verdict for the plaintiff you must find, from a preponderance of the evidence, that the defendant company was negligent in the manner stated in the complaint—that is, that it suffered the wire to be and remain in contact with the wires of the fence for an unreasonable length of time after it knew or should have known of such contact, and that said negligence was a direct and proximate cause of the death of Corina Mares."

But instead gave to the jury an instruction upon general negligence, as follows:

"If you find from a preponderance of the evidence in this case that the defendant was negligent in the construction or operation or maintenance of its said electric plant and lines, so that as a proximate result of such negligence the said electric wire came in contact with said fence and being and remaining in contact therewith was the proximate cause of the death of the said Corina Mares, then your verdict should be for the plaintiff in such sum as you may determine he is entitled to under other instructions given by the court; but, on the other hand, if you do not believe that the defendant was negligent in the construction, operation or maintenance of its said plant and lines and that the death of the said Corina Mares resulted proximately therefrom, then your verdict should be for the defendant."

It must be assumed from this instruction that the court viewed the pleadings as containing a charge of general negligence; and the fact that he refused appellant's requested instruction No. 6, which conformed with paragraph 5 of the complaint, indicates that he was not relying entirely on paragraph 5 of the instructions for the charges of general negligence, notwithstanding paragraph 4 of his instruction would seem to so indicate.

Paragraph 4 is an unnecessary, though proper, instruction. We find nothing in it harmful to appellant. Under such circumstances the instruction if erroneous is not a ground for reversal. Territory v. Gallegos, 17 N.M. 409, 130 P. 245; Spencer v. Gross Kelly & Co., 22 N.M. 426, 163 P. 1087; 5 C.J.S. title Appeal and Error, § 1763.

■ But if the court's instruction was correct his reasons for giving it are immaterial. Roth v. Scruggs, 214 Ala. 32, 106 So. 182; McStay v. Citizens' Nat. Trust & Savings Bank, 5 Cal.App.2d 595, 43 P.2d 560; Caldwell v. City of New York Ins. Co., Mo.App., 245. S.W. 602. In Narvaiz v. S. F., N. W. Ry. Co., 35 N.M. 303, 296 P. 575, we held that a correct judgment would not be reversed because the court based it upon erroneous grounds. In that case we cited with approval Cork v. Lehigh Valley R. Co., 98 N.J.L. 143, 119 A. 88, in which it was held that though a ruling on a motion for a directed verdict rested upon fallacious grounds, it was not reversible error if the instruction was justified on any other ground stated in the motion.

We will not reverse a judgment because the trial court's reasons for giving a correct instruction were fallacious; though we do not hold they were in this case.

■ The fact that appellee had overlooked the allegations in paragraph 6 of his complaint in presenting his case to this court, is no reason or justification for holding that the trial court erred, when in truth his instruction submitted the proper issue to the jury. The burden here is upon appellant to establish that the trial court erred, and this cannot be accomplished by a contention that appellee has overlooked some point favorable to him.

In Hepp v. Quickel Auto & Supply Co., 37 N.M. 525, 25 P.2d 197, the assignment of error was "the evidence offered by plain-tiff was sufficient to support a verdict in her favor."

In support of this appellant argued that the rule res ipsa loquitur was applicable, not that there was affirmative evidence of negligence. But we held that the assignment should be sustained notwithstanding the appellant's reasons therefor were fallacious, as there was sufficient evidence of negligence to require the case to be submitted to the jury.

■ The instructions of the court regarding the rule res ipsa loquitur were correct; and we think it is immaterial if the court and the appellee erroneously assumed it was authorized under one paragraph of the complaint, if in fact it was authorized at all, and we have held that it was. In other words it was immaterial how the court arrived at the conclusion that negligence generally was pleaded, if in truth it was.

■ We have carefully re-examined the evidence supporting an inference of negligence arising from the rule res ipsa loquitur, and do not find as a matter of law, that it was balanced or overcome by appellant's evidence. It was an issue for the jury and not this court to settle.

Appellant complains that our decision imposes on it "restrictions inconsistent with the practical operation of its business and to make it, in effect, an insurer against any accident."

■ It was not our intention to use language that could be so construed, and

think it is not open to this criticism. We adhere to the language used, but that there may be no mistake, we add that while power lines are dangerous agencies and reasonable care (which necessarily is a high degree of care) must be exercised in their construction and operation, particularly when such lines are built along streets and highways; yet the convenience of the public requires their operation; and the degree of care required does not go to the extent of defeating a practical operation of power systems, nor to making the owners insurers against injuries caused by their operation.

It is contended that this court erred in failing to apply the rule, "that where an objection to testimony is once made and ruled on and the testimony erroneously admitted, the objection need not be repeated as to testimony of the same class." We stated in our original opinion that the objections made to the introduction of the testimony in question, were in general terms, except in one instance, and that the testimony admitted in that instance was not prejudicial, even if erroneously admitted. If we were in error regarding the appellant's objections to this testimony, it will not change the result.

The testimony elicited by the cross examination complained of as it appears on pages 120, 121, 126, 167 and 168 of the transcript referred to by appellant, was in substance that the witness did not know of a place on appellant's lines where the wires were "wrapped around each other;" that the lines at places ran through trees, but a path was cut for them; that one pole in the line was leaning at a considerable angle, and out of line with the others; that another pole "leans a little, but not much." It was rather to appellant's advantage that only two posts could be found out of perfect alignment in its power lines.

If it was error to admit this testimony, it was only technically so, as it is of a trivial character and could not have changed the result. The case will not be reversed on that account. Palatine Insurance Co. v. Santa Fé Mercantile Co., 13 N.M. 241, 82 P. 363.

The motion for a rehearing will be overruled.

It is so ordered.

HUDSPETH, C. J., and SADLER, BICKLEY, and ZINN, JJ., concur.